**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**LAURA BARNES,**

       **Plaintiff,**

**v.**                                **Civ. Action No. 2:09-cv-51**

**MICHAEL ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**
       **Defendant.**

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

      Plaintiff, Laura Barnes (Claimant), filed a Complaint on April 17, 2009, seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on December 17, 2009.[2] Claimant filed her Motion for Summary Judgment on January 15, 2010.[3]  Commissioner filed his Motion for Summary Judgment on March 12, 2010.[4]  Claimant filed a Response to Commissioner's Motion for Summary Judgment on March 24, 2010.[5]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 16.

[3] Docket No. 9.

[4] Docket No. 21.

[5] Docket No. 22.

1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

2.    Defendant's Brief in Support of Motion for Summary Judgment.

3.    Claimant's Response to Defendant's Motion for Summary Judgment.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** and the action be **REMANDED** because the ALJ failed to consider all medical evidence of record, indicate the weight afforded to the medical opinions, and examine whether Claimant's impairments meet the C criteria of Listing 12.02.

2.    Commissioner's Motion for Summary Judgment be **DENIED** for the same reason set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income on July 7, 2006, alleging disability since September 19, 2003.  (Tr.128-136). The claim was denied initially on September 19, 2006.  (Tr. 93-102).  Thereafter, on October 12, 2006, Claimant filed a Request for Reconsideration.  (Tr. 103).  The claim was denied upon reconsideration on January 2, 2007.  (Tr. 106-11).  Claimant filed a written request for a hearing on January 4, 2007.  (Tr. 112).  Claimant's request was granted and a hearing was held on February 27, 2008.  (Tr. 28-68, 118).

The ALJ issued an unfavorable decision on April 29, 2008.  (Tr. 11-23).  The ALJ determined Claimant was not disabled under the Act because she had no impairment or

combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) and there were jobs existing in significant numbers in the national economy that Claimant can perform (20 C.F.R. 404.1560©, 404.1566, 416.960©, and 416.966). (Tr. 19-22). On May 20, 2008, Claimant filed a request for review of that determination. (Tr. 9-10). The request for review was denied by the Appeals Council on April 2, 2009. (Tr. 1-3). Therefore, on April 2, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on July 25, 1960, and was forty-three (43) years old as of the onset date of his alleged disability and forty-seven (47) as of the date of the date of the ALJ's decision. (Tr. 128). Claimant was therefore considered a "younger person," under age 50, under the Commissioner's regulations on both the onset date and date of the ALJ's decision. 20 C.F.R. §§ 404.156©, 416.963© (2010). Claimant graduated from high school and is one Algebra class away from completing four years of college. (Tr. 32-33, 149). Claimant last worked as a flagger for a construction company. (Tr. 43, 143). Claimant's past work history includes working at a mattress store and a hotel. (Tr. 44-45, 143).

C.      Medical History

The following medical history is relevant to the sole issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints of pain and functional limitation were not entirely credible:

**Psychological Report, West Virginia Disability Determination Service, Dr. Fremouw, 9/20/02 (Tr. 234-39)**

- chief complaint: stroke on February 15, 2002; sleeping problems; no cognitive complaints; no memory impairment; no speech problems secondary to stroke
- symptom/physical: headaches; trouble sleeping; good appetite; does not cry; no suicidal or homicidal; energy level is "below far;" mood is variable; worries frequently; does not have specific phobias; does not have panic attacks; denied PTSD
- mental status examination: clean and casual appearance; cooperative attitude; excellent social skills; excellent speech; oriented x 4; anxious mood; affect was appropriate and friendly; thought processes were logical and coherent; no delusions or obsessions; enjoys crossword puzzles and walking in the park; worrisome; no hallucinations or illusions; no need for psychiatric care; judgment within normal limits; no suicidal or homicidal ideations; immediate memory within normal limits; recent memory within normal limits; no agitation, pacing, or fidgeting
- WAIS-III
  - verbal IQ                            92
  - performance IQ                       95
  - full scale IQ                        94
  - verbal comprehension index           98
  - perceptual organization index        99
  - working memory index                 86
  - verbal subtest:
    - vocabulary                  10
    - similarities                9
    - arithmetic                  7
    - digit span                  8
    - information                 10
    - comprehension               9
  - performance subtest:
    - picture completion          11
    - coding                      7
    - block design                9
    - matrix reasoning            10
    - picture arrangement         10
- Validity:
  - internal: adequate; no problems with hearing or vision
  - external: full scale IQ is 94 and consistent with educational level; no areas of significant weakness; working memory index is slightly below full scale IQ
- WRAT 3
  - reading        107     post high school
  - spelling       105     post high school
  - arithmetic     74      fifth grade
- diagnosis:
  - Axis I: (309.24) adjustment disorder with anxious mood - mild
  - Axis II: no diagnosis

      - Axis III: post status CVA
- prognosis: good

**Outpatient Treatment Records, MedPlus Health Care, 4/23/03 - 10/9/07 (Tr. 247-66, 278-92, 347-60, 405-40, & 473-83)**

4/23/03
- subjective: blood work done; worried about blood pressure
- plan: get a PT and PT T; return if any problems

5/6/03
- subjective: visit for F/U on status post CVA with vascular abnormality of the brain; not getting much out of Neurontin, other than making her tired and giving her more neuritic pain on the left side; no GI complaints
- objective: healthy, anxious; neurologically intact
- plan: liver, PT, PTT, GGT done; stop Neurontin; start working with PT because of moderate back and left leg weakness secondary to favoring that

7/8/03
- subjective: intermittent episodes of dysphagia; PMG is significant for CVA; still has a chronic dysphagia and has choking spells
- objective: mildly obese; neurologically intact
- plan: placed on prenatal vitamins

9/18/03
- subjective: developed CVA at young age and still has swallowing problems; having panic attacks, anhedonia, and difficulty sleeping; some vegetative signs of early depression; PMH is significant for the CVA; exercising 2-3 times/week
- objective: appropriately disgusted, mildly tearful female; cooperative; neurologically intact
- assessment: status post cerebrovascular disease; major depression
- plan: Prozac and Klonopin

11/5/03
- subjective: head cold; headache and sinus problems; cough; no shortness of breath; no sweats
- objective: pleasant; no adenopathy
- plan: continue Dimetapp; given Avalox; continue Ultram

11/10/03
- subjective: head congestion; nose bleeding; right nares; not sleeping; not taking her Klonopin and is taking Dimetapp
- objective: does not appear to be in any distress; sinus film looks fine; no neck stiffness; throat clear; no adenopathy; lungs are clear
- assessment: follow-up sinusitis
- plan: stop Dimetapp; go back on Klonopin

1/27/04
- subjective: PMH is significant CVA, hypertension, GERD, and on chronic anticoagulant therapy; very shaky; balance is not right; moderate tremor; nightly headaches
- objective: anxious; weakness of left leg; tremor in the hands bilaterally; weakness of left arm; difficulty swallowing
- assessment: headaches secondary to Ultram; gastroesophageal reflux disease stable; status post

cerebrovascular accident on Plavis, stable; blood pressure good
- plan: increase Klonopin
7/2/04
- subjective: complains of the antidepressants; walking three miles/day; feeling much better; has some right knee pain since she fell on both her knees about six months ago; pain from knee down
- objective: looks good; gait is steady; speech is clear; calm and articulate; grips are equal and firm; some lateral joint line tenderness of the right knee
- assessment: status post CVA; right knee pain
- plan: wean off Prozac over three week period; referred to physical therapist for knee
7/23/04
- subjective: feels great; happy; only residual from stroke is sensation problems on left side; doing great; going back to school; biggest problem is GERD
- objective: looks better than ever; GERD - no wheezing or pulmonary symptoms
- plan: send to Dr. Heiskell to evaluate GERD and dysphagia; continue Prevacid
9/16/04
- subjective: had a carotid ultrasound, EGD, and colonoscopy; nothing found in stomach; found on polyp in the colon; Dr. Heiskell told her she has a large hiatal hernia; saw a neurologist who told her to stop taking Plavix; heartburn; denies coughing up blood despite telling Dr. Heiskell that she did; no shortness of breath; no chronic cough
- objective: no distress
- assessment: GERD; DUB; Anemia; dysmenorrhea
- plan: take Protonix twice/day; pelvic ultrasound;
10/7/04
- came in for CBS, follow up anemia; did not show up for pelvic ultrasound; complains of being tired and having a headache; stopped Plavix
7/20/05
- subjective: headaches; blood pressure problems; status post CVA; has some rhinosinusitis, but it is stable; no chest pain; no palpitations; no prescyncope; mild visual disturbances; no shortness of breath; chronic arthritis pain in lower back; weakness in left arm and leg; tingling sensation; trying to go to college; some memory loss; personality changes; hard to stay focused; short-term memory loss; hard time swallowing; chokes easily; DUB slowed
- objective: cranial nerves 2-12 are WNL; no adenopathy; no thyromegaly
- plan: refilled Ultram; start on Tarka
7/20/05
- x-rays of L Spine and CXR
- impression:
        - L Spine: illegible
        - CXR: illegible
7/25/05
- subjective: in for follow-up; elevated homocystine level; has neuropsych scheduled; lower back pain; weakness on left side; spondylolisthesis at L4-L5
- objective: no adenopathy; no thyromegaly; mildly spasmed lower paraspinal muscles
- plan: follow up in 2 weeks

8/8/05
- subjective: headaches completely eradicated after starting on the Tarka; back pain; may have a lesion in LS spine; leg wakes her up at night; struggling to get through school, but she thinks she can do it;
- objective: recommend physical therapy for leg and foot; positive straight leg test more so on left than right
- plan: refer to PT and get MRI of LS spine; start on Naprapac
8/22/05
- subjective: blood pressure is good; did not go see neuropsych; didn't see her today because she missed her neuropsych appointment; will see her when she sees neuropsych
10/31/05
- subjective: retaining fluids and wants a diuretic; gained a lot of weight
- plan: blood pressure is still up, put on Lasix; explain diet management to her
6/20/06
- subjective: h/o CVA; had pre-syncopal episode - diaphoretic, nauseous, couldn't concentrate; no slurred speech, broke out in a sweat, had trouble swallowing but she thought it was secondary to panic; lower back pain; has spondylolisthesis; concerned she might have a GI bleed based on symptoms
- objective: cranial nerves 2-12 WNL; grips are strong and equal
- plan: increase Tarka; continue Ultram; refer to Dr. Azzouz for neurological evaluation
6/27/06
- subjective: GI bleed secondary to taking too many aspirin; chronic back pain; degenerative disc disease; neurological deficit secondary to CVA; some short-term memory loss; hard to keep things straight; has spondylolisthesis; unable to go to PT; hasn't yet had the MRI on lower back; ROS are stable
- objective: heart and lungs are clear and regular; no edema; Hgb is up
- plan: start taking Iron twice/day
7/21/06
- assessment: blood pressure increased; headaches
- primary diagnosis: cerebral vascular disease
- secondary diagnosis: HTN
7/31/06
- subjective: stepmother doesn't think she is taking her medications; neurological deficits from CVA; short-term memory loss; blood pressure is up and down; exemia on hands; always afraid she will have another cerebral vascular event
8/29/06
- subjective: dizziness; always leans to the right; history of anemia, but borderline and not really symptomatic
- objective: unable to understand me when I want her to track a pen; cranial nerves 2-12 are within normal limits; no adenopathy; no thyromegaly; no bruits
- assessment/plan: Antivert; refilled Tramadol for chronic back pain
9/18/06
- subjective: vertigo - shaky and nauseated; believe she has not been taking her blood pressure medicines on a regular basis - compliance has been a problem; rash on left lower abdomen and

left fact - looks like cigarette burns; lumbosacral pain with radiculopathy down the left; cervical pain; get EKG to assess left ventricle
- objective: extremities within normal limits; still has deficit of thought blockage and poor short-term memory
- assessment/plan: given Silvadene cream for burns; neuropsych evaluation; get MRI of brain and LS spine

9/26/06 letter from Dr. Satterfield
- problems with uncontrolled hypertension, anemia secondary to GI bleeds and uterine fibroids; single mutation on the DNA analysis MTHFR and an elevated level of homocysteine; mild residual in left side, weakness of left arm, and left leg with a tingling sensation; severe GERD, COPD, mild dysphasia; significant short-term memory loss; forgets when she takes medications; easily-overwhelmed; degenerative disc disease of lumbosacral area

10/17/06
- subjective: stopped Metoprolol on her own and the vertigo stopped; wants to begin therapy for back; discomfort in lumbosacral area
- assessment/plan: wants more Tramadol, but it's not due and I can't keep giving it to her simply, she can actually take too many. Follow up with Dr. Azzouz and neuropsych, which she hasn't done. Remains tachycardic. Otherwise no change in condition

10/19/06
- x-ray only

11/2/06
- subjective: Dr. Azzouz wants her on Toprol XL; problem is claimant took herself off Metoprolol, which we had her own for hypertension and tachycardia
- assessment/plan: give Toprol

11/21/06
- subjective: quit taking Toprol - said it wasn't working and caused Vertigo; heart rate is slightly high; not taking her iron - it makes her sick; otherwise stable
- objective: HEENT within normal limits; cranial nerves 2-12 are within normal limits; extremities are within normal limits

12/5/06
- subjective: had a headache recently, but otherwise is feeling fine; really no change in her condition
- objective: HEENT within normal limits; no adenopathy or thyromegaly; extremities are within normal limits

12/19/06
- subjective: came in for help setting up neuro appointment; been having occasional headaches
- objective: blood pressure is up; cannot get her to take beta blockers - she needs to
- plan: otherwise stable

3/1/07
- chief complaint: hit her head in a car accident; worried it will affect her head because of stroke

4/2/07
- subjective: BP is up; heart rate is up; did not take medicine today; try to send her to gastroenterology to get an EGD; needs to stay off aspirin and NSAIDS
- objective: funduscopic exam is normal; no edema seen in extremities; neurologic intact

- plan: see back in one week
4/13/07
- follow-up appointment
5/17/07
- subjective: not sleeping; worried she will have another CVA; afraid of getting overheated; pain above left eye and sore there; shaking episodes; has not seen GYN; best to get a hysterectomy; significant reflux; needs evaluated for an EGD and colonoscopy
- objective: anxious; funduscopic exam is normal; extremities showed no edema; neurologic is intact; forgetful and has interrupted thoughts; dyshidrotic eczema of the palms
- plan: see back after she sees the specialists
10/9/07
- subjective: headaches; dizziness; anemic - still will not see gynecology or gastroenterology to find out why she is anemic; headache behind left eye frontal - sounds like typical migraine; referred her to neurology, but hasn't seen the neurologist; back pain
- objective: vital signs are stable; funduscopic exam is normal; mildly tender around left orbit; extremities showed no edema; neurologic intact
- plan: leave everything alone

**Medical Report, Dr. Heiskell, 8/2/04 (Tr. 243-46)**
- chief complaint: dysphagia
- past medical history: stroke, GERD
- review of systems: denies claudication and joint pain but has difficulty with gait (veers to the left if too tired); denies anxiety or depression; denies slurred speech, amaurosis, numbness, tingling, loss of consciousness and hemiplegia
- impression: dysphagia, GERD, history of stroke, history of carotid angioplasty, coagulopathy secondary to Plavix, hemoptysis
- recommendations: recommend esophagogastroduodenoscopy after obtaining a carotid duplex scan; refer to pulmonologist due to hemoptysis

**Outpatient History and Physical Exam, Dr. Weimer, 8/10/04 (Tr. 401-04)**
- chief complaint: stroke
- exam: awake, alert; oriented; attention good; steady gait; coordination intact;
- plan: post colonoscopy - start ASA; Plavix

**Operative Report, Monongalia General Hospital, Dr. Heiskell, 8/27/04 (Tr. 240-42)**
- admitting diagnosis: dysphagia, GERD, anemia
- operation: esophagogastroduodenoscopy with multiple biopsies and colonoscopy with polypectomy

**Ultra Sound Report, Fairmont General Hospital, Dr. Rosiello, 10/19/04 (Tr. 269)**
- ultrasound pelvis
- history: DUB, anemia
- impression: 8.8mm Fibroid; uterine measurements normal; no free fluid or pelvic mass; some minor cystic changes in either ovary

**Ultra Sound Report, Fairmont General Hospital, Dr. Rosiello, 10/19/04 (Tr. 268)**
- transvaginal
- impression: small cystic areas in each ovary; no free fluid; small fibroid with nabothian cyst formation as well

**MRI Report, Fairmont General Hospital, Dr. LaPlante, 7/28/05 (Tr. 267)**
- brain w/wo contrast
- reason for exam: CVA, H/A
- impression: few tiny white matter densities probably small vessel ischemic change; otherwise unremarkable exam

**Outpatient Treatment Records, Dr. Azzouz, Fairmont Physicians, 8/15/05 - 12/28/06 (Tr. 337-46 & 469-72)**
8/15/05 MRI report
- procedure: brain w/wo contrast
- reason for exam: CVA, H/A
- impression: a few tiny white matter densities probably small vessels ischemic change; otherwise unremarkable exam
7/10/06 letter to Dr. Clark
- physical exam: pleasant; alert; oriented; somewhat slow in responses; cranial nerves intact; uvula was midline; good gag reflex; mild decrease in temperature sensation on left; no facial sensory loss noted; gait intact with no ataxia
- summary: mild cognitive impairment; schedule for neuropsychiatric testing
7/10/06
- chief complaint: referred by Dr. Clark for neuro symptoms
- developed vertigo and dysphegia; increased blood pressure; having short-term memory loss; decreased concentration skills
9/11/06
- complaints/history: still has dizziness
- exam: short-term memory loss; no visual field loss
- assessment: illegible
9/18/06
- non-compliance with medication
10/31/06
- history/complaints: follow-up appointment; feels better; shooting pain; increased blood pressure
- exam: short-term memory loss; decreased sensation on left side
- assessment: illegible
12/28/06
- history/complaints: follow-up appointment; no psych testing
- assessment: short-term memory loss

**Physical Residual Functional Capacity Assessment, Dr. Pascasio, 8/9/06 (Tr. 293-300)**
primary diagnosis: S/P CVA/ Spondylolisthesis/HBP/GERD

Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited, other than as shown for lift and/or carry
Postural Limitations
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid even moderate exposure
- comments: agree with ALJ decision from 9/18/03: "It is the decision of the ALJ . . . that the clmt is not entitled to a period of disability."
Symptoms
- credibility: so far seems to be credible
Comments
- insufficient evidence prior to DLI


**Psychological Evaluation, Martin Levin, 9/12/06 (Tr. 301-04)**
- general observations: pleasant and cooperative; somewhat anxious; posture and gait within normal limits; no unusual involuntary movements; did not seem to need assistance in moving
- chief complaints: can't multi-task; trouble with memory
- symptoms: difficulty multi-tasking; memory problems; anxiety; worrisome; nervous; sleeping problems; trouble swallowing despite adequate appetite; denies crying spells and suicidal ideation
- intellectual assessment:
     WAIS III
     - verbal IQ          92

- performance IQ                87
                - full scale IQ                 90
                - verbal comprehension          98
                - perceptual organization       93
                - working memory                90
                Verbal Subtest
                - vocabulary                    11
                - similarities                  9
                - arithmetic                    10
                - digit span                    8
                - information                   9
                - comprehension                 6
                - letter number sequencing      7
                Performance Subtests
                - picture completion            6
                - digital symbol coding         6
                - block design                  10
                - matrix reasoning              11
                - picture arrangement           8

- IQ validity: WAIS-III scores are consistent with WRAT-III scores as well as academic record and work history
- WRAT-III
                - reading       102     high school
                - spelling      103     high school
                - arithmetic    84      7th grade
- WRAT-III validity: consistent with WAIS-III scores as well as her academic and work history mental status examination: pleasant and cooperative but anxious; adequate communication skills; oriented to person, place, time, and circumstance; anxious mood; broad affect; thought processes within normal limits; thought content within normal limits; denies hallucinations, illusions, and deja vu; insight within normal limits; mildly advanced psychomotor behavior; mildly deficient judgment; no suicidal/homicidal ideations; immediate and recent memory within normal limits; remote memory mildly deficient; concentration within normal limits; persistence within normal limits; pace somewhat slow
- diagnosis:
                - Axis I         300.02 generalized anxiety disorder
                - Axis II        no conditions present
                - Axis III       residual effects of a stroke, as reported by the claimant
- prognosis: poor


**Psychiatric Review Technique, Dr. Capage, 9/18/06 (Tr. 305-18)**
- medical disposition: impairment(s) not severe
- categories upon which the medical disposition is based:
                - 12.06 anxiety-related disorders - a medically determinable impairment is present that
                does not precisely satisfy the diagnostic criteria above: adjustment disorder with anxious

mood
- functional limitations:
      - restriction of activities of daily living: none
      - difficulties in maintaining social functioning: none
      - difficulties in maintaining concentration, persistence, or pace: none
      - episodes of decompensation, each of extended duration: none
- evidence does not establish C criteria
- claimant's statements found to be credible

**Psychiatric Review Technique, Dr. Capage, 9/18/06 (Tr. 319-32)**
- medical disposition: RFC assessment necessary
- categories upon which the medical disposition is based:
      - 12.06 anxiety-related disorders - a medically determinable impairment is present that
      does not precisely satisfy the diagnostic criteria above: GAD
- functional limitations:
      - restriction of activities of daily living: mild
      - difficulties in maintaining social functioning: mild
      - difficulties in maintaining concentration, persistence, or pace: moderate
      - episodes of decompensation, each of extended duration: none
- evidence does not establish C criteria
- claimant's statements found to be credible

**Mental Residual Functional Capacity Assessment, Dr. Capage, 9/18/06 (Tr. 333-36)**
<u>Understanding and Memory</u>
- ability to remember locations and work-like procedures: not significantly limited
- ability to understand and remember very short and simple instructions: no evidence of
limitation
- ability to understand and remember detailed instructions: moderately limited
<u>Sustained Concentration and Persistence</u>
- ability to carry out very short and simple instructions: no evidence of limitation
- ability to carry out detailed instructions: moderately limited
- ability to maintain attention and concentration for extended periods: not significantly limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual
within customary tolerances: not significantly limited
- ability to sustain an ordinary routine without special supervision: not significantly limited
- ability to work in coordination with or proximity to others without being distracted by them:
moderately limited
- ability to make simple work-related decisions: no evidence of limitation
- ability to complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent pace without an unreasonable
number and length of rest periods: moderately limited
<u>Social Interaction</u>
- ability to interact appropriately with the general public: not significantly limited
- ability to ask simple questions or request assistance: no evidence of limitation

- ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: not significantly limited
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation
- ability to respond appropriately to changes in work setting: not significantly limited
- ability to be aware of normal hazards and take appropriate precautions: not significantly limited
- ability to travel in unfamiliar places or use public transportation: not significantly limited
- ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment
- claimant has severe mental impairments that do not meet nor equal the Listings.  They do impose moderate limitations upon functioning as reflected by the ratings.  She retains the mental-emotional capacity to perform routine work-related activities in a low-pressure setting

**Psychiatric Review Technique, Dr. Kuzniar, 12/6/06 (Tr. 361-74)**
- medical disposition: RFC assessment necessary
- categories upon which the medical disposition is based:
    - 12.06 anxiety-related disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: GAD
- functional limitations:
    - restriction of activities of daily living: moderate
    - difficulties in maintaining social functioning: moderate
    - difficulties in maintaining concentration, persistence, or pace: mild
    - episodes of decompensation, each of extended duration: none
- evidence does not establish C criteria
- full credibility indicated as the function report statements were generally not contradicted by the CE results

**Psychiatric Review Technique, Dr. Kuzniar, 12/6/06 (Tr. 375-88)**
- medical disposition: impairment(s) not severe
- categories upon which the medical disposition is based:
    - 12.06 anxiety-related disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: adjustment disorder with anxious features
- functional limitations:
    - restriction of activities of daily living: none
    - difficulties in maintaining social functioning: mild
    - difficulties in maintaining concentration, persistence, or pace: none
    - episodes of decompensation, each of extended duration: none
- evidence does not establish C criteria
- the claimant's statements made to the CE examiner were generally consistent with observations indicating full credibility

**Physical Residual Functional Capacity Assessment, Dr. Lateef, 12/29/06 (Tr. 270-77)**
primary diagnosis: history of CVA
<u>Exertional Limitations</u>
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited, other than as
shown for lift and/or carry
<u>Postural Limitations</u>
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
<u>Manipulative Limitations</u>: none
<u>Visual Limitations</u>: none
<u>Communicative Limitations</u>: none
<u>Environmental Limitations</u>
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid all exposure
<u>Symptoms</u>
- credibility: partial; does appear to have intermittent neuro deficits on exam but does not appear
to meet or = any appropriate listing; c/o difficulty swallowing but no weight loss
<u>Comments</u>
- RFC reduced to light

**Physical Residual Functional Capacity Assessment, Dr. Lateef, 12/29/06 (Tr. 270-77)**
primary diagnosis: history of CVA
<u>Exertional Limitations</u>
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited, other than as
shown for lift and/or carry

Postural Limitations
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid all exposure
Symptoms
- credibility: claimant's reported sx and limitations are vague and not completely consistent with MER
Comments
- previous decision is from 2003; based on more recent MER, RFC reduced to light

**Medical Report, Michael Parsons, University Health Associates, 1/12/07 (Tr. 441-44)**
- impressions and recommendations: history of medullary CVA; displayed mild deficits in speed of information processing, encoding of complex information into memory, and complex attention and concentration; may need to evaluate whether she is accruing additional cerebrovascular damage over time; continue assistance at home; repeat evaluation in 9 months

**Psychological Evaluation, Tony Goudy, 8/13/07 (Tr. 446-51)**
- presenting symptoms: residual problems related to past stroke including physical limitations and difficulty with memory and concentration; generalized anxiety; chronic motor tension - tight muscles and frequent tension headaches; uncomfortable in public;
- mental status exam:
    - psychomotor activity: fine motor tremor in both hands
    - interpersonal attitude: somewhat reserved but cooperative
    - mood/affect: anxious; blunted
    - speech and communication: invariably coherent; frequently off task
    - suicidal ideation: denied
    - perception: denied
    - orientation: well-oriented to time, place, person, and circumstance

- memory: immediate memory intact; recent memory mildly impaired; remote memory appeared moderately impaired
- concentration: markedly impaired
- intellectual functioning: average range
- judgment: intact
- diagnostic impressions:
- Axis I        300.02 generalized anxiety disorder
- Axis II       799.9 diagnosis deferred
- Axis III      see medical section above
- Axis IV       unemployment, financial problems
- Axis V        Current GAF: 55-60
- summary and recommendations: appears anxiety supersedes that of a simple adjustment disorder; meets diagnostic criteria for Generalized Anxiety Disorder; marked impairment in concentration.  Should be assessed under 12.06 Anxiety-Related Disorders, specifically generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning.  Believed she suffers from the following B criteria: mild impairment in activities of daily living; mild to moderate impairment in social functioning; marked impairment in concentration, persistence, and pace; and no episodes of extended duration.

**Medical Assessment of Ability to do Work-Related Activities (Mental), Tony Goudy, 8/22/07 (Tr. 452-54)**
Making Occupational Adjustments
- follow work rules: good
- relate to co-workers: good
- deal with the public: poor
- use judgment: good
- interact with supervisor(s): good
- function independently: poor
- maintain attention/concentration: poor
- deal with work stresses: poor
Making Performance Adjustments
- understand, remember, and carry out complex job instructions: poor
- understand, remember, and carry out detailed, but not complex job instructions: fair
- understand, remember, and carry out simple job instructions: fair
Making Personal-Social Adjustments
- maintain personal appearance: good
- behave in an emotionally stable manner: fair
- relate predictably in social situations: poor
- demonstrates reliability: fair
Capability to Manage Benefits
- can the individual manage benefits in her own best interests: yes

**Psychiatric Review Technique, Tony Goudy, 8/22/07 (Tr. 455-68)**

categories upon which the medical disposition is based: 12.06 Anxiety-Related Disorders
- anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following:
- generalized persistent anxiety accompanied by the following:
- motor tension,
- autonomic hyperactivity,
- apprehensive expectation, and
- vigilance and scanning

D.    Testimonial Evidence

Testimony was taken at the hearing held on February 27, 2008.  The following portions

of the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q    And your birth date is 7/25/60?
A    Yes.
Q    You have three years of college?
A    Yes.
Q    And - -
A    A little over three.
Q    Over three?
A    Yes.
Q    Almost finished?
A    Yes.
                              *              *              *
Q    Okay.  You say you have almost four years of college.  When will you finish up?
A    When I can complete an algebra class I can't seem to get through.
Q    The algebra is the only thing holding you up?
A    Yes.
Q    How long have you been going to school?
A    Off and on since I graduated from high school.
Q    In the last four years.
A    In the last four years.  I know I didn't go within the last year, but I, sorry.  I'd say 2005, I can't, you only remember the - -
Q    Is that when you started going?
                              *              *              *
A    No, I started soon as I graduated from high school.
                              *              *              *
Q    In 2005 did you go?
A    Yeah.  The years go so quick, times goes so quickly I can't, yes.
Q    2004 - -

A        Yes.

*                    *                    *

Q        Did you go in 2006?
A        Yes.  Yes I did.
Q        And 2007?
A        No.

*                    *                    *

Q        Do you live with anyone?
A        No.

*                    *                    *

Q        Do you have a drivers license?
A        Yes.
Q        About how many miles do you drive in a week, approximately?

*                    *                    *

A        Maybe 20 miles.  I don't drive very far.
Q        Do you read and write?
A        Yes.

*                    *                    *

Q        In your own words tell me what it is, I'm sorry.  You indicated in your application that the date of onset of your disability was January 19th of 2003.  Can you tell me why you feel you became disabled on that date?

A        I had my stroke in 2002.  And I don't think I accepted my limitations and everything began to hit home that I couldn't do things as well as I could prior to the stroke.  My endurance, I noticed was not as long and my cognitive ability.

ALJ      Okay.

A        And my, I noticed my memory.  I have a chalkboard in my kitchen now, and I, which helps a lot.

Q        Okay.  And have you been working since your onset date?

A        I've tried.  No, but not.  But I have attempted.

Q        What did you attempt to do?

A        A friend of my has a, it's called an ice plant, but they have their little convenience store inside of it.  And I attempted to work there.  And, that would involve like answering the phone from the drivers that would deliver the ice, and you know, run a register and I worked there for I'd say a week, two weeks.

ALJ      Okay.

A        Week and a half.

Q        Anything else since then?

A        I'm thinking back, no.  I watched my nephew's little baby some, you know, like for an hour, a hour and a half while he, his girlfriend, while, he's a UPS driver, when she goes to work until he gets home, like an hour, an hour and a half.  But I don't do that anymore.  I mean he wasn't paying me or - -

Q        When did you do that?

A        Oh, just within the last couple months.  But I would call him and tell him to come home, if he would want to stop off some where.

19

Q       Can you tell me in your own words what it is that keeps you from being able to work at some type of job?

A       I get, I don't know how I feel from one day to the next. I can't tell you what I will wake up feeling like tomorrow. As I like last night I didn't get to sleep until 7:00 this morning. And it seems like that's like every other night. It's, and I wake up with headaches and I just say might as well not even get up. I'll just take some Advil and roll back over and put my cold pack on my head and just wait until my headache is gone to get up. So, some days I just don't venture out. I know my brother's, not too long ago he had to, he checks on me if I don't answer my phone or some.

Q       How do you fill your day? You tell me what you do during the day.

A       It's never consistent. If it's a feel good day I will get up and I'll normally have some coffee and take a shower. And I'll run, if an errand needs run, I'll try to do it on one spurt. I don't like to come and go, and because I know I'm tired out when I get home. And, a nap usually comes along, when I try not to do. But, and some days I don't do anything. Some days I can't. I mean I brush my teeth and wash, but I won't venture out.

Q       Do you do your shopping?

A       Yes.

Q       Cleaning?

A       Yes.

Q       Do laundry?

A       Yes.

Q       Are you able to shower and take care of your hair?

A       Yes.

Q       Cooking?

A       I have temperature numbness, so I try to eat ready made foods.

Q       What do you mean temperature numbness?

A       I, the left side of me I can't distinguish hot from cold.

ALJ     Uh-huh.

A       And if it's something extremely hot, it seems like electrical shocks does it, or extremely cold, they shutter through my body, the right side of my face. And I tend to on the left side, my left side is weaker. I tend to drop. I've broken lots of dishes. And.

Q       Do you have any type of palsy or any after effects on the left side of your face?

A       The right side of my face.

Q       The right side.

A       It affected the right side. My eye, it always feels like there's cobweb or something in it.

ALJ     Uh-huh.

A       And I get lazy with it.

ALJ     Okay.

A       Yeah. I am, but it seems like I have my pain on this, above this brow constant. It almost feels like a bruise.

ATTY        Is that your left side you're pointing to?

CLMT        Yes. It's odd. It's the right side of my face down here, but up here is

20

what, I even had them take an x-ray because I thought something, my skull was cracked. Because when I touch it, it's tender. But it's right above my brow is where I get my really, really bad headaches.

BY ADMINISTRATIVE LAW JUDGE:

Q      Do you have any hobbies to help past the time?

A      I play a game on the computer. I have a cat.

Q      Any activities outside the home that you're just - -

A      Occasionally I'll go to church.

Q      Do you visit with any friends or relatives?

A      I visit with my brother or my father. There's a friend that lives the next block down, very, my nephew. People that live very close to me. Or you know, unless they're family. My father lives in Fairmont.

Q      Do you do any sweeping or vacuuming?

A      Yes.

Q      Are you able to carry your groceries in the house when you go to the school?

A      Not all at one, one time.

Q      If they're light bags?

A      Yes.

Q      Do you have any pets that you care for?

A      I have a cat.

Q      Do you have any form of exercises that they've given you to do at home?

A      Yes they have. But I can tell you I didn't follow through.

Q      Do they bother you in some way or just haven't gotten around to doing them?

A      It bothers me. It, I just don't have the endurance - -

Q      To do?

A      I mean I get frustrated.

Q      Uh-huh.

A      I don't know. I haven't, but I tend to, I have an exercise bike that I can, that of course doesn't bother me.

Q      Do you use that?

A      Not as much as I should, but yes I do.

Q      About - -

A      Not that often?

Q      - - how many times a week?

A      I'd say once every two weeks. But it's not for a long period.

Q      Do you have any trouble sitting or standing?

A      Both. Standing I tend to overcompensate for the left side of, you know, my weakness with my right side. And I, they did an x-ray on my back and it caused it to go out of line. So it makes my lower back, I just can't, don't get comfortable.

Q      How long can you stand without having to sit, and sit without having to stand?

A      I don't know. It's hard for me to put a time limit on that because I.

                              *              *              *

Q      When you go for a walk, how far can you go or how long?

A      I'd say half a mile, but I'm if I would sit down at that point and I, I have tried it

21

before.  You know there's a park.

Q      Sure.

A      And it's a mile and a half around.  But halfway around there's a park bench.

Q      So, if you go shopping are you pushing the cart for 20 minutes or 30 minutes or whatever?

A      I don't do long shop.  I do as I need to basis.

                    *                    *                    *

Q      Do you play any games with your family or friends?

A      I play Scrabble with my friend that lives beside me.  With she and her mother.

Q      Do you have any side effects from your medications?

A      The Clonapin and I, but I take those at nighttime right before I go to sleep so I won't feel the effects as strongly in the daytime.

Q      Sure.

A      They did want me to take one of the Clonapin in the morning but I actually refused because I wouldn't get out of bed.

Q      Sure.

A      I don't like the loopy.

Q      So there's some drowsiness, but it's at night?

A      Yes.  When it yeah.  But it still, it's not enough to sometimes knock me out.  Like as of last night I can't believe I was, I was like again.   I was looking at the clock, 7:00 in the morning.  It's just like, almost like every other night.

Q      Do you take it on empty stomach or with food?

A       Well since it's an evening, a couple hours after dinner, so.  I take with a glass of water, you know, before I go to sleep.

Q      What doctors do you see on a regular basis?

A      Her name is Susan Garner.  I was going to Med Plus, but they were bought out by some doctors from Fairmont General.  And they put a time limitation for the patients.  And they became more of like a quick care place.

Q      How often do you see Dr. Garner?

A      Well as of now it's like once a month.

Q      Do you see any other doctors or counselors?

A      There's a doctor.  He's a neurologist.

Q      How often do you see him?

A      Maybe like once a year.

Q      Okay.

A      It's been longer than a year since I've seen him though.

Q      Anyone else that you see on a regular basis?

A      I'll probably think of somebody when I walk out.

Q      Well maybe before you walk out.  Can you - -

A      I'll just say right now - -

Q      Can't think of anybody.

A      Okay.  I can't think of anyone.

Q      Can you tell me the last time you had physical therapy?  Or, if you had physical therapy?

| | |
|---|---|
| A | I have had physical therapy. |
| Q | Do you remember what year? |
| A | What year.   2003, 2004, I. |
| Q | Did you take any trips with your family or friends? |
| A | Not as much as I used to. |
| Q | But sometimes? |
| A | It's pretty much stopped.  I try to continue, and it didn't really work out for me.  I get anxious. |
| Q | Tell us a little bit about the type of work that you've done, your last job.  What was it? |
| A | I flagged.  That was my very last.  I was a for J.F. Allen. |
| Q | How long did you do the flagger work? |
| A | It was just one season.  It was - - |
| Q | How many months about? |
| A | About three months. |
| Q | Okay.  What were your duties? |
| A | To hold up the stop sign from the to limit cars from driving into the work zone. |
| Q | Did you have to lift anything heavier than a stop sign? |
| A | No. |
| Q | And how much do you think that weighed? |
| A | It's pretty heavy. |

*                    *                    *

| | |
|---|---|
| Q | 20 pounds? |
| A | But it was braced on the - - |
| Q | On the ground? |
| A | Yeah, yeah. |
| Q | About 15 pounds or what? |
| A | I'd say more like 30. |

*                    *                    *

| | |
|---|---|
| Q | And what did you do before that? |
| A | I had a mattress store. |
| Q | Mattress store? |
| A | Yes. |
| Q | That was with your father? |
| A | Yes. |
| Q | And how long did you work there? |
| A | Ten years. |
| Q | What were your duties there? |
| A | I believe it was ten years.  Just about everything, owner, operator.  I did the bookkeeping, sales, ordering, the banking.  Just a little bit of everything. |
| Q | Why did you leave that job? |
| A | My father owned the building - - |
| Q | Okay. |
| A | - - where the store was, and he sold - - |

Q    Okay.

A    - - the building.

Q    What did you do after that?  That's when you went to the flagger job?

A    Yes.

Q    What did you do before that?

A    I worked at a hotel.

Q    Uh-huh.

A    I was assistant manager there.

Q    What did your duties consist of?

A    Working at the front desk, and interviewing, hiring and north [phonetic] paperwork, scheduling.

Q    Did you have to do any lifting in that job, and if so, how much was the heaviest amount?

A    I don't believe there was any lifting at that.

Q    How about in the job as a sales - -

A    Mattress place?

Q    - - mattress store?

A    Yes.  There was lifting there.

Q    How much do you think?

A    How much does a queen-sized bed weigh?

Q    Oh, pretty good.

A    Sometimes I would go with my father and I and one other guy to deliver something.  And I would help.

Q    Help lift the headboard?

A    Help carry the mattress in.

Q    And set up the bed?

A    Really, my father bore most of the weight, but - -

Q    Right.

A    - - I would kind of balance.

Q    So pretty heavy?

A    Yeah.  Yes.  I'd say so.  But if he was around he wouldn't allow me, you know.

Q    Okay.  More than 50 pounds then, sometimes?

A    Sometimes, yeah.  It's, but he very rarely if he was there, no.

                    *              *              *

Q    Have you had to go to the emergency room in the last couple or three years because of your conditions, or been confined in the hospital?

A    No.

Q    All right.  Mr. Bailey.

ATTY Thank you, Your Honor.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    Ms. Barnes, I want to try to ask you several questions.  And there's several areas, and I'm not sure which to go first.  But we can start by talking about trying to speak about when the Judge started the questioning.  When do you feel like you became unable to be employed?  And she mentioned 2003, I believe it was.  And she may have asked you why you alleged that

24

date.  As you're seated here today, what would be your best answer as to when you think you became unable to be employed?

A    When I realized that I couldn't operate as efficiently as I wanted to.   And when I did try to work and I couldn't.

Q    Well I noticed that you had a stroke in 2002.  Is that fair to say?

A    Yes.

Q    And then you filed an application for disability in March of '02.  So do you think you may have been disabled then?

A    Yes.

                    *              *              *

Q    So, if I can clarify, in '02 you had the stroke, and you thought you would come back from that?

A    Oh yeah.

Q    And you tried to come back from that?

A    I tried, yes, I tried, yes.

Q    And you - -

A    But not as quickly as I thought out, I mean I didn't try to come back as quickly as I thought I would.  Does that make?

Q    Are you saying you were not as successful as quickly as you thought you might be?

A    No.  I didn't try to come back as quickly as I thought that I would.

                    *              *              *

Q    And I'm not all surprised.  So let's just skip over that for the time being, and go to the fact that there's some indication in the record there in '03, late '02 and into '03 that you were exercising, running?

A    I wasn't running.  I've never ran.

                    *              *              *

Q    And so that I think you've alluded to and some of the records then indicate that after a while, after a year or so of trying to come back, you say that you found that you could not?

A    Correct.  Correct.

Q    And so that you had, what kind of a wall, or what kind of a situation did you come up against that you couldn't get around?

A    Prior to that, I always exercised frequently, and I didn't have a problem.  I mean I would walk.  The park was my favorite place to be.  And, I was an on the go person.  And I just didn't, I became where I wanted to stay in.  And if I did go out I would feel, get ill.  I'd be afraid that I would get ill, and there would, and I wouldn't be able to get home.  Home was my safe place to be.  I'd be afraid I'd be out and I'd get a headache and I'd be too far away from home.

Q    And this would have been back some three, four years ago?

A    Yes.  Yes.

Q    Still present like that today?

A    Oh yes.  If anything, the headaches are worse.

                    *              *              *

Q     Do you have a headache now?

A     Yes.

Q     I noticed that when you testified you'd take your left hand and you'd kind of touch or push on your head.  Why is that?

A     Almost I just did it then, didn't I? Maybe getting the answer out.

Q     You think it helps you - -

A     Pulling the answer - -

Q     - - think?

A     - - out of my head, metaphorically.

Q     The Judge asked you some questions about college.  I'd like to clarify if I can. After your stroke in 2002, you didn't start college then did you?

A     No.

Q     You'd already been to college?

A     Yes.  Yes.  Yes.

Q     And in fact I think the record supports, and I think the Judge realizes that you actually went to a hearing on a disability claim back in '03.

A     Okay.

Q     Do you recall that?

A     If you say it was in '03, I.

Q     Okay.  After that hearing I noticed that you, you went into vocational rehabilitation?

A     Yes.

Q     And who was that with?

A     Sharon Martin.

Q     And as a part of that rehab, what did she have you try to do?

A     Go to school, go back to school.

Q     So you actually went back at that point to try to finish your degree?

A     Yes.  Yes.  And I had other class besides the algebra.  But I had professors that allowed me to, it would take me longer to do a test.  But they would allow me to go, when everyone else was finished I could go in a room by myself or go to the library to finish.

Q     Would you characterize or would you say that your vocational rehabilitation with Sharon Martin, was that successful or unsuccessful?

A     Well on paper it would be unsuccessful, but personally, because I did get some classes done I'd say.  But I did - -

Q     So you did a little bit?

A      Yes.  I did a little bit, yes.

Q     Now, the Judge has asked you and I can't hardly read my writing.  But the Judge has asked you about trips with your friends.  And is it fair to say that before your stroke you were pretty active in taking trips or being out of West Virginia?

A     Yes.  Very frequently.  Yes.

Q     Where would you go?

A     Miami, California.

Q     Places like that?

A     Yes.

Q       Las Vegas?
A       Not prior, no.
Q       After your stroke?
A       After, yeah.
Q       You one time with to Las Vegas
A       Yes.  With my brother.
                    *                    *                    *
Q       And what happened on that occasion?
A       I pretty much stayed in the room.  I didn't, I - -
Q       Do you remember what - -
A       Oh, oh.  Another friend of ours went, and we were out shopping.  And I had to sit down.  I thought I was going to be ill.  And, I said you can stay out.  I have to go back to the room.  I mean I had to sit down and put my head down.
Q       Do you remember what year that was?
A       '05?
Q       Okay.  That's all right.  Your best recollection.  Because I noticed that in the records with Dr. Clark there was a time there in '04 and into early '05 seemed like your blood pressure got out of control.  Do you recall that?
A       I, - -
Q       It's okay.
A       Is - -
Q       You can say if you recall or not.
A       No.  I mean no.
Q       Okay.
A       I mean any worse than - -
Q       Than ever?  Okay.  How about feeling sick or dizzy?
A       Very frequently.
Q       Did you ever have feelings like you were going to have another stroke?
A       Yes.  Yes.  Yes.
Q       And did that concern you?
A       Yes.  Actually that time in Las Vegas I was fearing.
                    *                    *                    *
Q       Well there's some evidence in the record from a neuro-psyche that seems to indicate that you have some motor problems, motor meaning coordination.  Do you notice those to your left side?
A       Oh yes, yes.  But I'll veer to the, I guess it's opposite to the, my friends say I go to the right.   I bump into walls in my house.
Q       To the right side?
A       Yeah, I'll make a turn, instead of going to the doorway, I'll work into the door jamb.
                    *                    *                    *
Q       And if I had you doing tests with your left hand, would your hand tire, get tired?
A       It's just it would not any tired, just that dexterity that I had is not there.
Q       If I used the word, loose coordination, would you agree with that?

A     Yes.

Q     And it seems like there's some evidence that you became awfully anxious. You worry a lot?

A     Yes.

Q     Can you tell the Judge what you worry about? Can you describe that to us?

A      I fear for my future. I worry about everything.

                          *              *              *

Q     Now the Judge asked you if you performed tasks around your house. Every day do you wash your clothes and do laundry?

A     Not every day.

Q     How often a week would you do that?

A     I can't say. It just depends on how I feel.

Q     Do you vacuum and clean your house every day?

A     Not every day. It just depends on how I feel. The vacuum cleaner is always plugged in. It's not like I put it away and bring it back out.

Q     Uh-huh.

A     It's in my kitchen already plugged in ready to go.

Q     Do you, and this is a tough question maybe, but do you bathe and wash your hair every day?

A     No.

Q     Some days do you - -


A     Well I, I do wash every day. But some days I see I caught a cat bath, or, with a wash rag. Because I do want the feeling of cleanly. Sometimes I take a shower without washing my hair.

                          *              *              *

Q     Tell the Judge about being withdrawn in your house and dismantling your doorbell.

A     I just, I don't like visitors coming over. It makes, peeking out the curtains. And I do put a note on my door, please do not ring doorbell. And then I finally thought of the idea to dismantle it. And, people they I don't.

Q     How about your brother? How do you know it's your brother that - -

A     Well he has a secret knock.

Q     So this is the brother here, Gary?

A     Yes, he has - -

Q     Has a secret knock?

A     Yes. That I know it's him.

Q     Uh-huh.

                          *              *              *

A     Since my kitchen is in the back I hear something and I go to the front of the house and I pick out this - -

Q     What about your phone? What about a phone ringing?

A     I have it off, and I keep it in front of me so I can just see the light, instead of it

ringing.  And I'm like it's ringing.

Q       Over the last four years or so, have you ever had any feelings that you want to avoid people you know because you maybe think they, or thinking bad thoughts about you?

A       Oh yes, yes.  Actually with my friends I had got to the point where I don't say yes every once in a while to do something before they pushed me out of the circle.  But now I don't at all.

Q       Do you ever start into conversations and forget what you're talking about?

A       Uh-huh.  Yes.

Q       Do you ever have trouble trying to stay at somebody else's overnight?

A       Oh, I can't do that.  Yeah.   I did stay at my brother's this winter when it was very, very cold though.  But that's morning early.

                         *                    *                    *

Q       You had a friend you traveled with a lot, a male friend, right?

A       Uh-huh.

Q       Right.  Are you still active with that individual?

A       Not active.  Friendly though, but not active.

Q       If I describe as losing that relationship, it's really backed down hasn't it?

A       Oh yes, yes.

Q       Uh-huh.  there's some evidence in the record after you had your stroke, that you sat around and you did crossword puzzles.  Do you sit around and do crossword puzzles?

A       I do have that, but I don't do them in one sitting.  And I don't do the whole puzzle.  I'll start and come back to it throughout the day.  I'll keep it like on my kitchen table, and maybe.

Q       But why do you not just sit down and do the puzzle?

A       It would make my head hurt.  I wouldn't be able to.  I get anxious, and then I don't want to, then I throw it away.  I don't want to do it.

Q       So you can't stay with it very long?

A       No.  I get frustrated.  I get anxious.

Q       There's also some evidence in the record, at least early that I'm going to use the phrase non-compliant with your medication or you wouldn't take your medication.  Do you have any information on that?

A       See, I think I was taking it.  I really do.  I don't.

Q       Try not to put your hand on your mouth.  That's okay.

A       I, that was my cumadin the doctor said I wasn't taking.  And I was taking it.

Q       If I characterized it just to the best of your memory you were taking it, would that be fair?  The doctor talks about having people help you - -

A       He - -

Q       - - take your medication.

A       Yeah.  Because he told my father and my step-mother outside of church that I wasn't taking it.

Q       Do they help you take it?  Do they help you make sure - -

A       Call me.

Q       - - you take it?

29

A        I was very upset about that - -
Q        Uh-huh.
A        - - because I said why would I not take my cumadin?  Why would I not want to take that?  I just felt like I couldn't get my blood regulated and.

*                    *                    *

Q        Since your stroke, have you had difficulty remembering dates?
A        Yes.  That's why I have a chalkboard in my kitchen.

*                    *                    *

Q        - - your stroke, did somebody come and check on you every day?
A        No.
Q        After your stroke have they pretty well checked on you most of the time?
A        Yes.
Q        Did you have headaches prior to your stroke as you describe them today?
A        No, no.
Q        They came on after the stroke?
A        This particular.  Yeah, if my father can't get a hold of me, he'll call, or brother.  I mean he'll drive over.
Q        Okay.  That's all I have, Your Honor.

*                    *                    *

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:
Q        Ms. Barnes, have you ever attended any type of psychiatric counseling?
A        Yes.
Q        When?

*                    *                    *

A        Would that be considered, well I did what they, oh counseling, or testing.  I'm sorry.  No.
Q        What counseling were you, a counseling where you go - -
A        Yeah.
Q        - - talk to somebody - -
A        No.
Q        - - for half an - -
A        No.
Q        - - hour, an hour?
A        I was confused with testing, no.
ATTY           Your Honor, may I ask the question on that vein?
BY ATTORNEY:
Q        It's my understanding that this Dr. Clark's office sat down with you a good bit and worked with your non-exertional aspects of your impairment, like your anxiety and your worry.  Did Dana Sadderfield  [phonetic] work with you some?
A        Oh yes.  Sue became a friend of mine.
Q        Okay.
BY ADMINISTRATIVE LAW JUDGE:
Q        Well, if she became a friend then she's not a counselor.
A        Well.

30

Q       So - -
A       That's true.
Q       - - was it someone you spent time with and you felt better with talking to?
A       She was, it was never outside the office.
Q       Okay.  So you went to see her pretty regularly?
A       Yes.  She was my physician actually.
Q       What was her name?
A       Dana Sadderfield.
Q       Ms. Sadderfield, oh yes.
A       Yeah.  She was - -
Q       She was a certified nurse practitioner - -
A       Yes.
Q       - - that you saw regularly?
A       Yes.  And I just felt very comfortable with her - -
Q       Of course.
A        - - to talk.
Q       And felt you could talk things over with her?
A       Yes.  Yes.
Q       All right.  Is there anything that we failed to ask you about that you would like to
tell us about?
A       No.

                    *              *              *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW
JUDGE:
Q       All right.  Would you please characterize the claimant's prior relevant work?
A       Her work as a flagger was only for three months, but that would be light and
unskilled.  And customer service manager at the hotel is sedentary and skilled. And the owner
operator, but basically doing bookkeeping and sales ordering, that would be light and skilled.
Q       All right.
A       That could swing up into the medium range, I believe, on occasion when they
were doing some lifting.
Q       All right.
A       But by and large it was light.

                    *              *              *

Q       Thank you.  If you assume a hypothetical person of the claimant's age, education,
background and work experience who can do a range of light work, would need a sit/stand
option, no climbing or ropes, ladders, or stairs, anything of that nature.  No temperature extremes
of cold or heat, no hazards such as dangerous moving machinery at unprotected heights, and an
instance where instructions may be written down.  Also needs an entry-level job, unskilled, one-
to two-step instructions, simple instructions, no intense concentration required constantly,
working with things as opposed to people, and limited contact with the public.  Could that
hypothetical person do the claimant's prior relevant work?
A       No, Your Honor.
Q       And are there any occupations at the light or sedentary level that such a

hypothetical person could perform?

  A  Yes.  At the light level that hypothetical individual, Your Honor, I believe could function as a laundry folder, light, 50,000 nationally, 550 regionally.

  Q  I'm sorry, I forgot one element.  I apologize, Mr. Bell.

  A  That's okay.

  Q  Some slight weakness in the left arm, which is the non-dominant arm.

  A  Okay.  Laundry folder light, 50,000 nationally, 500 regionally, or office assistant, light, excuse me, 150,000 nationally, 1,850 regionally.  And at the sedentary level, a general sorter, sedentary, 50,000 nationally, 650 regionally, or a machine tender, sedentary 141,000 nationally, 1,400 regionally.

  Q  And if a person were to be off tasks in these jobs, whether it's due to lack of concentration, persistence or pace, or for any reason whatsoever, how much time off tasks would be tolerated generally?

  A  If a person's going to be off tasks, some locations would are more stringent than the others, five to nine percent.  But once you hit the ten percent or above, then I believe that's going to eliminate the ability to work at the competitive level, Your Honor.

  Q  How much absenteeism is tolerated?

  A  If a person is going to miss two of more days per month, then I believe the supervisors would attempt an intervention.  And if it wasn't successfully changed, it would result in termination.

  Q  In your experience or because of being aware of the needs of the job, or the way the job is performed, would any of these jobs that you have named require what I would term multitasking, meaning that you have to think of and do various functions all at the same time, that wouldn't be rather rote in routine?

  A  These would be pretty rote and routine, Your Honor.

*    *    *

  EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

  Q  Mr. Bell, if the weakness in the left arm or hand was not only just a weakness, but was a motor skill problem, that worsened over the day or over the time period of working such that that person would be again perhaps off task with her left hand as you testified at ten percent or more of the time.  Would that affect these jobs that you've named?

  A  The, as long as you could use your left hand, your non-dominant hand in a supportive way, then these jobs probably wouldn't be affected.  But if it was weak and hurting and took you away from your ability to concentrate, then that would be a problem.

  Q  I guess my question is at some point ten percent of the time, 20 percent of the time, anything above ten percent of the time, but I'll just hypothetically say 30 percent of the time that hand's not going to function and coordinate and fold.  Or it's going to be held down at the side because it's hurting.  Does that impact the jobs?

  A  Well, I think it would be more likely to affect the laundry folder and the general sorter job.

  Q  And in these machine tendering jobs you've testified to, if a person has an organically based, I'm going to call it coordination problem.  And after they get a little tired they start drifting to their right side, would that impact these jobs?

32

A       Well, basically with these machine tender jobs, it's sedentary. You're seated. But if I mean if you were, I don't know how that changes your question.

Q       But one of the questions was light. And I assume by light there would be some standing involved operating the machines.

A       Well the machine tender there's, I thought you were, what you were - -

Q       Is more than sedentary?

A       Yeah. It would be sedentary.

Q       And your testimony is that would be sedentary so she would be seated?

A       Yes.

Q       And does that machine job require good vision out of both eyes?

A       Well you have to be able to see to replace the materials that the machine is using, so.

Q       Sure. Office assistant, is that job, if you're working in an office, that connotates you're going to be around people?

A       Well, you'd be around people in all these jobs, but it wouldn't be, you wouldn't be, in all these jobs, but it wouldn't be dealing with the public. You'd be like copying, addressing envelopes, those kinds of things.

Q       If this person, this hypothetical person, see again I think that's, I have no more questions, Your Honor.

                        *            *            *

E.       <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- lives alone (Tr. 34)
- has a drivers license and drives approximately 20 miles each week (Tr. 34, 170)
- has a chalkboard in her kitchen on which she writes reminders (Tr. 35, 58)
- is able to shop (Tr. 37, 170)
- is able to clean (Tr. 37)
- does her own laundry (Tr. 37, 169)
- is able to shower and take care of her hair (Tr. 37, 167)
- is able to run errands (Tr. 37, 167)
- sometimes takes naps during the day (Tr. 37, 167)
- does not cook but eats "ready made foods" due to temperature numbness on left side of her face (Tr. 37)
- plays games on the computer (Tr. 38)
- takes care of a cat (Tr. 38, 39, 167, 168)
- occasionally attends church (Tr. 39)
- visits with family and friends who live nearby (Tr. 39)

- spends time with others weekly (Tr. 171)
- is able to run the vacuum (Tr. 39)
- is able to carry grocery bags (Tr. 39)
- does not do the recommended at-home-exercises (Tr. 39)
- rides a stationary bike (Tr. 39-40)
- has trouble sitting and standing (Tr. 40)
- can walk approximately half of a mile before needing to rest (Tr. 40)
- can walk one mile (Tr. 172)
- plays Scrabble with her neighbors (Tr. 41)
- is unable to take as many trips with family and friends as she used to (Tr. 42-43, 50-51)
- can no longer exercise as frequently as she did before the stroke (Tr. 48)
- sometimes loses balance when walking (Tr. 52-53)
- does not like visitors at her house (Tr. 54)
- loses her thought during conversations (Tr. 55)
- does not like to stay at other people's houses (Tr. 55)
- does crossword puzzles throughout the day (Tr. 56)
- spends time outside everyday - weather permitting (Tr. 167, 170)
- watches television (Tr. 167)
- talks on the telephone (Tr. 167)
- has trouble sleeping (Tr. 168)
- can no longer multitask or concentrate (Tr. 168)
- does not take care of her hair like she did before her stroke - performs basics to keep clean and presentable (Tr. 168)
- does not cook but eats frozen meals (Tr. 169)
- can no longer cook - used to cook for fun in free time (Tr. 169)
- needs help performing yard work (Tr. 169)
- is able to go out alone (Tr. 170)
- is not able to pay bills, count change, handle a savings account, or use a checkbook/money order (Tr. 170)
- builds puzzles and reads for fun daily (Tr. 171)
- visits her dad on a regular basis (Tr. 171)
- is easily irritated (Tr. 172)
- socializes less since her stroke (Tr. 172)
- can pay attention for an hour (Tr. 172)
- does not follow written or spoken instructions well (Tr. 172)
- has trouble finishing what she starts (Tr. 172)
- does not handle stress well (Tr. 173)
- step mother delivers home-cooked meals for her (Tr. 179)


### III.  The Motions for Summary Judgment


A.    <u>Contentions of the Parties</u>

Claimant first argues that the ALJ's decision is not based on substantial evidence and is based on an error of law because the ALJ's finding is contrary to the medical evidence of record. Second, Claimant argues the ALJ erred by failing to consider all medical opinions relating to Claimant's capacity to work. Finally, Claimant argues the ALJ erred by failing to consider the possibility that Claimant's condition may have met the "C" criteria of Listing 12.02.

Commissioner contends that substantial evidence does support the ALJ's decision, and the ALJ did not err by failing to consider the medical opinions relating to Claimant's capacity to work.

B.    Discussion

1.    Whether the ALJ's Decision is Based on Substantial Evidence Supported by the Medical Evidence of Record.

Claimant argues the ALJ's decision is not based on substantial evidence and is based on an error of law. Specifically, Claimant argues that the ALJ's decision is not supported by substantial evidence because the decision that Claimant's condition "significantly improved" is directly contradictory to the evidence of record. To support this contention, Claimant cites medical evidence from Drs. Clark, Goudy, and Satterfield. Additionally, Claimant argues that the ALJ's decision is based on an error of law because the ALJ failed to mention the vast majority of evidence that supports Claimant's disabled status and contradicts the ALJ's decision.

Commissioner contends that substantial evidence supports the ALJ's decision. Specifically, Commissioner contends that the medical evidence of record does not support a finding of disability. To support this contention, the Commissioner argues the medical evidence demonstrates that Claimant improved following the 2002 CVA.

In her Response to Commissioner's Motion, Claimant argues that Commissioner's

argument is non-responsive to Claimant's argument.[6]  Specifically, Claimant contends that Commissioner's brief failed to address the evidence cited by Claimant and "appears to be largely generalized legal citations and vague arguments with little to no application to [Claimant's] specific arguments."  (Dkt. 22, P. 1).  Claimant also argues that Commissioner's argument mirrors the ALJ's general conclusion: "The Commissioner's brief merely contains the summary statement that '. . . the record shows that [Claimant] maintained the significant improvement she made following her 2002 CVA.'" (Id., P. 2).

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3) (West 2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3)

---

[6] Under the Local Rules, the Commissioner "is specifically directed to address **all of the contentions and arguments** made by the plaintiff in the same order in which the plaintiff has stated them in his or her brief."  LR Gen P 86.02.  The Court cannot agree with Claimant's contention that the Commissioner failed to respond.  The Commissioner dedicates nearly three pages addressing both facts and law to argue that substantial evidence supports the ALJ's decision.  Accordingly, the Court will proceed with the substantive argument.

(West 2010).

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b) (West 2010).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(2) (West 2010).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight."  Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2) (West 2010).  See Craig, 76 F.3d, at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

To decide whether the impairment is adequately supported by medical evidence, the Social

Security Act requires that impairment, physical or mental, be demonstrated by medically

acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3) (West 2010);

Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508 (West 2010); Throckmorton v.

U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Courts "cannot determine if findings are supported by substantial evidence unless the

Secretary explicitly indicates the weight given to all of the relevant evidence."  Gordon v.

Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).

> The courts . . . face a difficult task in applying the substantial evidence test when the
> Secretary has not considered all relevant evidence.  Unless the Secretary has analyzed all
> evidence and has sufficiently explained the weight he has given to obviously probative
> exhibits, to say that his decision is supported by substantial evidence approaches an
> abdication of the court's 'duty to scrutinize the record as a whole to determine whether
> the conclusions reached are rational.'

Id. at 236 (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)).

Here, not only did the ALJ not indicate the weight given to the relevant evidence, but

also the ALJ barely considered the objective medical evidence of Drs. Clark, Goudy, and

Satterfield.  The ALJ briefly mentions Dr. Goudy stating only that the "August 13, 2007

psychological evaluation resulted in a diagnosis of generalized anxiety disorder . . . [and] a

global assessment of functioning (GAF) score of 55-60.  Mental status examination showed that

immediate memory was intact, recent memory was mildly impaired, and remote memory was

moderately impaired.  The claimant's level of intellectual functioning was deemed 'average' and

her judgment and insight were intact (Exhibit B22F)."  (Tr. 20).  Exhibit B22F comprises 24

pages of medical records.  Included in the records is Dr. Goudy's opinion that Claimant's

"anxiety supersedes that of a simple adjustment disorder and . . . meets the diagnostic criteria for Generalized Anxiety Disorder." (Tr. 450). Nowhere in the decision does the ALJ cite this evidence and explain the reasoning for discounting the opinion.

Drs. Clark and Satterfield were two primary treating physicians for Claimant. Their records combine to equal 96 pages of medical records - Exhibits B4F, B7F, B14F, B20F, and B24F. Despite the nearly 100 pages of medical evidence, the ALJ only mentions the records twice in the decision. First, the ALJ cites Exhibits B7F and B14F to support his conclusion that "the evidence shows that the claimant has not always been compliant with her medications." (Tr. 19). Exhibits B7F and B14F are 15 and 14 pages, respectively, yet the ALJ comes to a one-line conclusion that the records indicate Claimant's non-compliance with her prescriptions. Second, the ALJ indicates that little weight is given to the opinions of Drs. Clark and Satterfield "who opined that the claimant 'is totally disabled due to her mental status' (Exhibit B20F)." (Tr. 21). Although the ALJ had no obligation to consider the ultimate issue opinions of Drs. Clark and Satterfield, the ALJ was obligated to consider the medical evidence that led the doctors to their opinion. The only reason given for discounting the ultimate issue opinion was because the "finding is contrary to the weight of the evidence." (Id). How though? What other medical evidence contradicts the opinion? What is included in the five exhibits, and how are they contrary to the other 19 exhibits? Drs. Clark and Satterfield submitted nearly 100 pages of medical evidence, yet the ALJ addresses them collectively in less than two paragraphs.

Therefore, the Court must agree with Claimant and REMAND the case to the ALJ for further analysis and elaboration on the opinions of Drs. Clark, Goudy, and Satterfield.

> 2.     Whether the ALJ Considered all Medical Opinions Relating to Claimant's Capacity to Work.

Claimant argues that the ALJ's decision is based on an error of law because the ALJ failed to consider all medical opinions related to Claimant's capacity to work. Specifically, Claimant argues that the ALJ failed to discuss the medical opinions of Drs. Parsons and Goudy - opinions that specifically discussed Claimant's ability to work.

Commissioner contends that the ALJ did not err but gave appropriate weight to the medical opinions related to Claimant's capacity to work. Specifically, Commissioner contends that opinions concerning Claimant's disabled status are meritless because they are not entitled to controlling weight. Additionally, Commissioner contends that "the mere diagnosis of an impairment is insufficient to prove disability." (Dkt. 21, P. 12).

In her Response, Claimant argues that Commissioner failed to respond specifically to Claimant's argument. Specifically, Claimant argues that "[n]owhere does the Commissioner explain where the ALJ considered Dr. Parson's opinion regarding [Claimant's] inability to function at home and her inability to work in competitive employment. Likewise, the Commissioner never tackles the ALJ's failure to consider, or even mention, Dr. Goudy's RFC functional capacity statement." (Dkt. 22, P. 4). Additionally, Claimant contends that while Commissioner argued that the opinions of Drs. Parsons and Goudy were not entitled to controlling weight, the "controlling weight" standard is inapplicable to the case. Rather, "[t]he issue here is that the ALJ failed to properly consider them." (Id., P. 5).

The Court first addresses Claimant's contention that the Commissioner failed to respond to Claimant's argument. Under the Local Rules, the Commissioner "is specifically directed to address **all of the contentions and arguments** made by the plaintiff in the same order in which the plaintiff has stated them in his or her brief." LR Gen P 86.02. Although the Court agrees

with Claimant in that the Commissioner failed to respond to this particular argument under a separate heading, the Court cannot say that Commissioner failed to respond altogether. In fact, this argument and Claimant's second part of the first argument are very similar; therefore, it is acceptable for Commissioner to address the two together. Accordingly, the Court will consider the Commissioner's response.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b) (West 2010). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id.

Here, Claimant argues that the ALJ failed to consider the medical opinions related to Claimant's capacity to work. However, Claimant fails to realize that the treating physicians' opinions at issue were on Claimant's disabled status. Claimant states that "Dr. Parsons stated that [Claimant] would have difficulty functioning in the competitive workplace, and would need continued assistance at home from her family. (Tr. 443)." (Pl. Br. P. 10-11). Similarly, according to Claimant, "Dr. Goudy found [Claimant's] concentration, persistence and pace were markedly impaired and further completed a mental functional capacity form noting several serious limitations in key areas. (Tr. 449, 452-54, 465)." (Pl. Br. P. 11). These conclusions by Drs. Parsons and Goudy are ultimate issue opinions. Opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Moreover, the ALJ is not obligated to "give any special

significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2)." § 404.1527(e)(3). The ALJ's only obligation is to "review all of the medical findings and other evidence that support a medical source's statement that you are disabled." § 404.1527(e)(1).

While the Court acknowledges that under the regulations, the ALJ had no obligation to give any significance to the ultimate issue opinions, the Court must again agree with Claimant because the ALJ failed to consider the medical findings that supported the doctors' opinion. The ALJ gives little weight to the ultimate issue opinions of Drs. Clark and Satterfield, and the ALJ was entitled to do so. However, the ALJ fails to mention the specific medical evidence included in the medical records of Drs. Clark and Satterfield that led them to such a conclusion. (Tr. 21). The ALJ simply dismisses the opinions stating that their "finding is contrary to the weight of the evidence." (Id). Therefore, the Court must REMAND the action to the ALJ for further consideration of the medical evidence of Drs. Clark and Satterfield.

3.      Whether the ALJ Erred by Failing to Consider the "C" Criteria of Listing 12.02.

Claimant argues that the ALJ's decision is based on an error of law because the ALJ failed to consider the possibility that Claimant's condition met the "C" criteria of Listing 12.02. Specifically, Claimant argues that the ALJ has a legal duty to consider whether a Claimant's condition meets the requirements of the relevant Listings. Claimant contends that the medical evidence supports a finding that Claimant's condition meets the "C" criteria and the ALJ failed to consider such evidence.

Commissioner contends that both the state agency physicians and the examining consultant for Claimant agree that Claimant's impairments do not meet the Listings.

42

In the Response, Claimant argues that Commissioner did not respond specifically to Claimant's argument because Commissioner's mention of the argument in a footnote was not a response. Additionally, Claimant argues that Commissioner's inability to respond to the argument is further evidenced by Commissioner's credibility argument. Claimant did not make a credibility argument in her original motion; therefore, that the Commissioner addressed credibility further evidences the inability to respond to Claimant's arguments.

The Court first addresses Claimant's contention that the Commissioner failed to respond to Claimant's argument. Under the Local Rules, the Commissioner "is specifically directed to address **all of the contentions and arguments** made by the plaintiff in the same order in which the plaintiff has stated them in his or her brief." LR Gen P 86.02. The Court agrees with Claimant. Though the Commissioner responded briefly in a footnote, the Court cannot condone the actions of the Commissioner. The Local Rule expressly provides that the Commissioner must respond to all contentions and arguments in the same order in which the Claimant addressed them in Claimant's brief. Here, the Commissioner simply mentions Claimant's third argument in a footnote. Nevertheless, the Court will address Claimant's third argument.

"An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." 42 U.S.C. § 423(d)(5)(A) (West 2010). The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3) (West 2010). At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20

C.F.R. § 404.1520© (West 2010).  A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities."  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).  An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities.  Claimants bear the burden of demonstrating they have a medically severe impairment.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).

Mental impairments are evaluated according to the listings under 20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00.  Listing 12.00 enumerates 10 different categories of mental impairments.[7]  Id.  To adequately establish a medically determinable impairment under Listing 12.00, there must exist "medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings)."  Listing 12.00(B).  Listing 12.02, Organic Mental Disorders, is characterized by "psychological or behavioral abnormalities associated with a dysfunction of the brain."  "History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities."  20 C.F.R. Pt. 404, Subpt. P, App. 1 12.02 (West 2010).  To meet the required level of severity for Listing 12.02, the Claimant must satisfy the requirements of both A and B or the requirements of C.  Id.  To satisfy the C criteria, the Claimant must demonstrate:

---

[7] 12.01 category of impairments - mental; 12.02 organic mental disorders;12.03 schizophrenic, paranoid and other psychotic disorders; 12.04 affective disorders; 12.05 mental retardation; 12.06 anxiety related disorders; 12.07 somatoform disorders; 12.08 personality disorders; 12.09 substance addiction disorders; 12.10 autistic disorder and other pervasive developmental disorders

Medically documented history of chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.      Repeated episodes of decompensation, each of extended duration; or
2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id.

When determining whether a Claimant's impairments meet the severity requirements for a relevant Listing, the ALJ must identify the relevant listed impairments, discuss the evidence, and compare the evidence to the listed impairments.  Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986); see also, Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 119 (3rd Cir. 2000) (holding that when determining whether the claimant's impairment is equivalent to an impairment listed in the federal regulations, the ALJ must set forth the reasons for his decision and that the ALJ's conclusory statement was beyond meaningful judicial review because it did not "identif[y] the relevant listed impairments, discuss[] the evidence, or explain[] his reasoning.").

In Cook, the ALJ considered whether claimant's impairments met Listing 1.01:

An examination and x-rays of the right hip and left shoulder in May 1983 established the existence of severe osteoarthritis with moderate to severe limitation of motion of the claimant's shoulders, elbows, wrists, knees, hips, neck, and back as well as markedly decreased grip.  However, the claimant's arthritis impairment does not meet or equal in severity the requirements of Section 1.01 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or other mandated criteria.

Cook, 783 F.2d, at 1172-73.   The Court found the explanation to be deficient for several

reasons. Of most importance to the present case, the Court found that the ALJ "failed to compare [the claimant's] symptoms to the requirements of any of the four listed impairments, except in a very summary way." Id. at 1173. Much like the ALJ's analysis in Cook, the ALJ in the case at bar failed to specifically compare Claimant's symptoms to the impairments. Rather, the ALJ summarily dismissed Claimant's ability to meet the C criteria:

> In this case, the evidence fails to establish the presence of the paragraph C' criteria. The evidence of record does not show repeated episodes of decompensation, each of extended duration; nor does it show a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; nor does it shows [sic] a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication for continued need for such an arrangement; nor does it show a complete inability on the part of the claimant to function independently outside the area of her home. Because the evidence fails to demonstrate that the claimant's mental impairments cause any of the foregoing, the 'paragraph C' criteria are not satisfied.

Though the ALJ's determination includes the requirements to meet part C of the 12.02, the ALJ offers no evidence to support his conclusion that the criteria are not satisfied. The Court cannot conclude whether the ALJ's decision is supported by substantial evidence unless the ALJ actually weighs the evidence. The ALJ only makes a conclusory statement that the evidence does not satisfy the C criteria. Accordingly, the Court must agree with Claimant and REMAND the case to the ALJ for further consideration of the evidence in conjunction with the C criteria of Listing 12.02.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** and the action be **REMANDED** because the ALJ failed to consider all medical evidence of record, indicate the

46

weight afforded to the medical opinions, and examine whether Claimant's impairments meet the C criteria of Listing 12.02.

        2.     Commissioner's Motion for Summary Judgment be **DENIED** for the same reason set forth above.

        Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: April 2, 2010

                /s/ *James E. Seibert*
                JAMES E. SEIBERT
                UNITED STATES MAGISTRATE JUDGE